UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| CARL J. DONLEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CAUSE NO. 1:17-cv-00430-SLC |
| | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, *sued as Nancy A.* | ) |
| *Berryhill, Acting Commissioner of* | ) |
| *Social Security*, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Plaintiff Carl J. Donley appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying his application under the Social Security Act (the "Act") for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").[1] (DE 1). For the following reasons, the Commissioner's decision will be REVERSED, and the case will be REMANDED to the Commissioner for further proceedings in accordance with this Opinion and Order.

### I. FACTUAL AND PROCEDURAL HISTORY

Donley applied for DIB and SSI in January 2014, alleging disability as of January 23, 2013. (DE 11 Administrative Record ("AR") 245-53). Donley was last insured for DIB on December 31, 2014 (AR 137), and therefore, he must establish that he was disabled as of that date with respect to his DIB claim. *See Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997) (explaining that a claimant must establish that he was disabled as of his date last insured in

---

[1] All parties have consented to the Magistrate Judge. (DE 14); *see* 28 U.S.C. § 636(c).

order to recover DIB benefits). The Commissioner denied Donley's application initially and he did not appeal; he instead filed new claims for DIB and SSI alleging disability as of May 1, 2008, which he later amended to January 23, 2013. (AR 12, 254-62). Donley's application was denied on initial consideration and on reconsideration. (AR 176-84, 186-92).

A hearing was held on August 24, 2016, before Administrative Law Judge Steven J. Neary (the "ALJ"), at which Donley, who was represented by counsel; a witness, Bonnie Mann; and a vocational expert, Charles McBee (the "VE"), testified. (AR 37-64). On November 7, 2016, the ALJ rendered an unfavorable decision to Donley, concluding that he was not disabled because despite the limitations caused by his impairments he could perform a significant number of unskilled, sedentary jobs in the economy. (AR 12-28). The Appeals Council denied Donley's request for review (AR 1-6), at which point the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481.

Donley filed a complaint with this Court on October 13, 2017, seeking relief from the Commissioner's final decision. (DE 1). In this appeal, Donley argues that the ALJ: (1) improperly evaluated the opinions of Dee Russell, his treating mental health therapist, and Rick Cain, his treating psychiatric nurse practitioner; and (2) failed to incorporate his moderate deficits in concentration, persistence, or pace into the hypothetical posed to the VE at step five. (DE 19 at 12-20).

At the time of the ALJ's decision, Donley was 44 years old (AR 28, 245); had obtained his GED and specialized job training in forklift and crane operation, safety, and welding (AR 291); and had past work experience as a factory laborer, a packer, and a welder fabricator (AR 292, 388). Donley alleges disability due to the following impairments: coronary artery disease,

2

with history of myocardial infarction, with coronary bypass and stenting; diabetes mellitus; hypertension; obesity; history of bilateral shoulder tendinopathy; history of right knee arthroscopy, meniscectomy, and chondroplasty; obstructive sleep apnea; major depressive disorder/bipolar disorder; anxiety/generalized anxiety disorder; and post traumatic stress disorder ("PTSD"). (DE 19 at 2). Donley does not challenge the findings of the ALJ in regard to his physical residual functional capacity ("RFC") (DE 19 at 2 n.1); rather, his arguments center on the ALJ's consideration of his mental impairments.

## II. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (citation omitted).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (citation omitted). "In other words, so long as, in light of all the evidence,

3

reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits." *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

### III. ANALYSIS

#### *A. The Law*

Under the Act, a claimant is entitled to DIB or SSI if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment or combination of impairments meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App'x 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[2] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citations omitted); 20 C.F.R. §§ 404.1520, 416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245

---

[2] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

F.3d 881, 886 (7th Cir. 2001) (citation omitted). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* (citation omitted). The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868 (citation omitted).

## B. The Commissioner's Final Decision

On November 7, 2016, the ALJ issued the decision that ultimately became the Commissioner's final decision. (AR 12-28). At step one of the five-step analysis, the ALJ found that Donley had not engaged in substantial gainful activity since his amended alleged onset date. (AR 15). At step two, the ALJ found that Donley had the following severe impairments: coronary artery disease, with history of myocardial infarction, with coronary bypass and stenting; diabetes mellitus; hypertension; obesity; history of bilateral shoulder tendinopathy; history of right knee arthroscopy, meniscectomy, and chondroplasty; obstructive sleep apnea; major depressive disorder/bipolar disorder; anxiety/generalized anxiety disorder; and PTSD. (AR 15). At step three, the ALJ concluded that Donley did not have an impairment or combination of impairments severe enough to meet or equal a listing. (AR 16).

Before proceeding to step four, the ALJ determined that Donley's symptom testimony was not entirely consistent with the medical evidence and other evidence of record. (AR 19). The ALJ then assigned him the following RFC:

> [T]he claimant has the [RFC] to perform sedentary work . . . except: no more than occasional climbing, balancing, stooping, kneeling, crouching, or crawling; and, no complex or detailed tasks, but the claimant remains capable of simple, routine tasks throughout the workday that do not require working with the general public.

(AR 18). Based on the RFC and the VE's testimony, the ALJ concluded at step four that Donley

could not perform any of his past relevant work. (AR 27). At step five, the ALJ found that Donley could perform a significant number of unskilled, sedentary jobs in the economy, including address clerk, document preparer, and surveillance system monitor. (AR 28). Therefore, Donley's applications for DIB and SSI were denied. (AR 28).

### C. The Opinions of Mr. Cain and Ms. Russell

Donley argues that the ALJ improperly evaluated the opinions of Ms. Russell, his treating mental health therapist, and Mr. Cain, his treating psychiatric nurse practitioner, both of Adams Memorial Hospital. Donley's argument is persuasive in part, necessitating a remand of the ALJ's decision.

The opinion of a nurse practitioner or a mental health therapist is not an "acceptable medical source" under the Social Security regulations, but rather is considered an "other source." *Masch v. Barnhart*, 406 F. Supp. 2d 1038, 1055 (E.D. Wis. 2005); SSR 06-03p, 2006 WL 2329939, at *1-2 (Aug. 9, 2006). Although information from an "other source" cannot establish the existence of a medically determinable impairment, it may be used "to show the severity of the individual's impairment(s) and how it affects the individual's ability to function." SSR 06-03p, 2006 WL 2329939, at *2; *see Koschnitzke v. Barnhart*, 293 F. Supp. 2d 943, 950 (E.D. Wis. 2003). "[T]he adjudicator generally should explain the weight given to opinions from these 'other sources,' . . . when such opinions may have an effect on the outcome of the case." SSR 06-03p, 2006 WL 2329939, at *6; *see Masch*, 406 F. Supp. 2d at 1055 (stating that opinions from "other sources" must not be ignored). "[D]epending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical

6

source,' including the medical opinion of a treating source." SSR 06-03p 2006 WL 2329939, at *4.

Here, Ms. Russell treated Donley from October 2012 to August 2016. (AR 797-874, 877-80, 896-900, 1232-1255). At his first visit, Donley reported a host of symptoms, including racing thoughts, a depressed mood, anxiety, difficulty concentrating, difficulty finishing tasks, low energy, racing thoughts, and irritability, but he denied suicidal or homicidal ideation. (AR 797). Ms. Russell assigned him a Global Assessment of Functioning ("GAF") score of 51 and indicated diagnoses of a depressive disorder, not otherwise specified ("NOS"), an anxiety disorder NOS, rule-out a bipolar disorder, and rule out PTSD.[3] (AR 797). Ms. Russell assigned Donley a GAF score of 55 in both May 2013 and July 2015, finding that his symptoms continued to improve with medication and counseling. (AR 800, 1232). Counseling sessions centered on his various mental symptoms; his relationship with his girlfriend; his economic circumstances, legal problems, and applications for disability; his physical problems; his low self esteem; and

---

[3] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000). A GAF score of 21-30 reflects behavior that is considerably influenced by delusions or hallucinations, a serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation), or an inability to function in almost all areas (e.g., stays in bed all day; has no job, home, or friends). *Id*. A GAF score of 31 to 40 reflects some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., avoids friends, neglects family, and is unable to work). A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id*. A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.* A GAF score of 61 to 70 reflects some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well. *Id*. And a GAF score of 71 to 80 reflects transient symptoms as expectable reactions to psychosocial stressors or a slight impairment in social, occupational, or school functioning. *Id*.

"The American Psychiatric Association no longer uses the GAF as a metric." *Spencer v. Colvin*, No. 13-cv-1487, 2015 WL 684545, at *17 n.5 (C.D. Ill. Feb. 17, 2015) (citing Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013)). However, several clinicians of record used GAF scores in assessing Donley, so they are relevant to the ALJ's decision. *See id*. (citing *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013)).

his depression and anxiety. (*See, e.g.*, AR 807, 812, 814-15, 835). Ms. Russell regularly documented that no at risk behaviors were reported or observed. (*See, e.g.*, AR 807, 812, 814-15, 835).

On August 23, 2016, Ms. Russell completed a medical source statement on Donley's behalf. (AR 1256-64). She stated that Donley was in a depressive episode since March 2013 that at times was very severe with suicidal ideation, fatigue, hopelessness, sleep disturbance, anger outbursts, and an extremely sad affect and mood. (AR 1256). Ms. Russell indicated that Donley suffers from anxiety in the form of panic attacks, social anxiety, and PTSD; that racing thoughts interfere with his sleep; that his medications cause extreme daytime fatigue and "brain fog"; and that at times he is "detached from reality." (AR 1257-58). She opined that therapy and medications resulted in mild improvement, but that his symptoms would worsen if he returned to full-time work, and that his mental illness would cause him to miss more than three days of work per month. (AR 1258-59). In particular, she opined that if Donley returned to work he would have problems with aggression, potentially putting himself and his coworkers in danger. (AR 1258, 1260). She stated that his attention and concentration were impaired by his mental illness; that he would remain on task less than 70% of the day; that he would have problems getting along with others in the workplace; and that his mood instability would cause anger outbursts, poor frustration tolerance, and relationship problems. (AR 1259-60). Ms. Russell opined that Donley should work alone or no more than two hours with others. (AR 1260).

Mr. Cain saw Donley for medication management every three months from June 2014 through August 2016. (AR 1265-74). Donley's diagnoses included a bipolar disorder, PTSD, a

8

generalized anxiety disorder, and insomnia. (AR 1266, 1268). Mr. Cain assigned a GAF score of 70 in January 2015 and June 2015, and a GAF score of 75 in July 2015, September 2015, and April 2016. (AR 1269-74). In June 2016, Donley told Mr. Cain that things were going "alright." (AR 1267). Clinical exams generally revealed an anxious mood and fair insight, judgment, and impulse control. (*See, e.g.*, AR 1265, 1267, 1274). Mr. Cain indicated that Donley's medications were effective or somewhat effective without any side effects. (*See, e.g.*, AR 1265, 1267). In August 2016, Donley denied any suicidal ideation and stated that his sleep was marginal to fair. (AR 1265).

On August 20, 2016, Mr. Cain completed a medical source statement on Donley's behalf. (AR 1223-31). He stated that Donley's depressive symptoms were recurrent and moderate to severe, with feelings of helplessness and hopelessness. (AR 1223). He had frequent mood fluctuations between anxiety and depression, moderate to severe, with fleeting suicidal impulses but no plan. (AR 1223). He suffered from generalized anxiety and social anxiety, and he had sleep problems due to his depression and anxiety. (AR 1224-25). Mr. Cain opined that Donley's symptoms would worsen if he returned to full-time work; that his mental illness would cause him to miss more than three days of work a month; that his mental illness would interfere with the attention and concentration needed for unskilled work such that he could remain on task less than 70% of the day; that his symptoms would cause him problems in getting along with the public, co-workers, or supervisors; and that he should work alone or apart in physical isolation from others, but that he could not work full-time. (AR 1226-27). Mr. Cain commented that Donley will struggle lifelong to find balance due to his mood fluctuations, sleep pattern disturbance, and bipolar disorder. (AR 1231).

9

The ALJ considered the opinions of Ms. Russell and Mr. Cain in detail, penning more than 10 paragraphs on the opinions. (AR 17, 22-27). The ALJ ultimately assigned limited weight to these opinions, finding that the severe limitations described by Ms. Russell and Mr. Cain in their questionnaires are inconsistent with the observations in their own treatment records, as well as other substantial evidence of record. (AR 17, 26). With respect to Ms. Russell, the ALJ explained that her treatment records document that Donley continued to improve despite his numerous cancellations of appointments and no-shows; that his relationship with his girlfriend was a major topic during counseling sessions; and that her treatment records do not reveal reports of daily panic attacks or isolation that Donley claimed to experience. (AR 23-25). With respect to Mr. Cain, the ALJ found that Donley's mental status examinations were unremarkable other than an anxious mood and affect; and that Mr. Cain regularly indicated that Donley's medications were effective or somewhat effective, without side effects. (AR 25).

More particularly, the ALJ explained:

> While the opinions expressed by Ms. Russell and Mr. Cain in August 2016 may have reflected an increase in symptoms at that time, their treatment records are inconsistent with many of the symptoms and deficits endorsed. Although Ms. Russell noted that medications cause drowsiness and "brain fog," the claimant denied medication side effects during treatment with Mr. Cain. Likewise, none of the records suggests that the claimant is "detached from reality," at times, as noted by Ms. Russell. Although both Ms. Russell and Mr. Cain attributed many of the claimant's deficits, particularly in terms of focus, concentration, and being able to maintain fulltime work with sleep problems, as discussed, with the exception of only two instances, Ms. Russell has consistently noted that no sleep disturbance was present since January 2016. Finally, Mr. Cain noted a GAF of 70 on June 1, 2015 (mild symptoms), and this was raised to 75 (transient symptoms and only slight functional impairment) by July 6, 2016. GAF remained 75 through April 18, 2016. As such, GAF assessments were essentially indicative of a normal functioning individual for 11

months, th[r]ough April 2016, the last time an estimate was
recorded. The only visit between April 18, 2016, and Mr. Cain's
completion of his questionnaire on August 20, 2016, was a session
of June 20, 2016. As discussed, mood, affect, and speech were
normal. In addition, the claimant was fully oriented, eye contact
was good, thought process and content were coherent, and suicidal
ideation was denied.

In addition, although both Ms. Russell and Mr. Cain opined that
the claimant would be unable to maintain appropriate workplace
interactions due to depression, mood instability, anxiety, and
various other mental symptoms, no mental symptoms were
reported or observed during primary care with Dr. Nussbaum from
September 6, 2013, through the most recent visit in evidence on
April 18, 2016. . . . No difficulties in interactions were noted.
Likewise, the claimant has specifically denied mental symptoms
during many visits with other providers. The claimant denied
anxiety and depression during emergency room visits in Ohio on
December 12, 2014, and on February 5, 2016. In addition,
although the claimant testified that he has difficulty leaving his
home and that he drives only short distances, at the time of this
treatment, the claimant had traveled to Bowling Green, Ohio, to
visit his girlfriend.

The claimant had denied anxiety and depression during a visit with
Dr. Pamidi on January 5, 2015, and review of systems was
negative for anxiety and depression during visits with cardiologist
Dr. Alshaher. This was the case during the most recent visit on
April 20, 2016. This is not to say that the claimant has never
reported anxiety and/or depression to treating sources, and when
seen at the emergency room on January 11, 2016, the claimant
reported that chest pain had significantly improved with Klonopin
taken at home. However, the lack of observations of significant
anxiety or depression during primary, cardiac, and emergent care
during the period serves to undermine Ms. Russell's and Mr.
Cain's opinions.

(AR 25-26 (internal citations omitted)).

Donley challenges several aspects of the ALJ's reasoning with respect to the opinions of

Ms. Russell and Mr. Cain. First, Donley argues that the ALJ erred by failing to acknowledge

and credit Ms. Russell's and Mr. Cain's opinions that his symptoms would worsen if he returned

11

to full-time work, and further erred by failing to credit their opinions that he would be absent more than three days a month. (AR 1225-26, 1228, 1258-59). Of course, an ALJ "need not address every piece of evidence in his decision." *Sims v. Barnhart*, 309 F.3d 424, 429 (7th Cir. 2002) (citation omitted). Rather, the ALJ must only "minimally articulate his or her justification for rejecting or accepting specific evidence of disability," which has been described as a "lax standard." *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008) (citation omitted).

Here, the ALJ gave several reasons why he did not fully credit the opinions of Ms. Russell and Mr. Cain, which reasonably were inclusive of these doctors' comments that Donley's symptoms would worsen if he were to return to full-time work and that absenteeism would be a problem. To explain, in her questionnaire Ms. Russell cited Donley's decreased concentration, medications, risk for aggression, and sleep disturbances as the bases for her opinion that Donley's symptoms would worsen if he were to return to full-time work and would result in absenteeism. (AR 1259). In his questionnaire, Mr. Cain similarly cited Donley's social anxiety, attention and concentration difficulties, poor sleep patterns, and mood instability as the basis for his assertion that Donley's symptoms would worsen if he were to return to full-time work and would result in absenteeism. (AR 1225-26). The ALJ discussed each of these concerns in his discussion of Ms. Russell's and Mr. Cain's opinions, and minimally articulated his findings concerning the severity of these symptoms.

In addressing Donley's social anxiety, the ALJ observed that although Donley claimed he had difficulty leaving home, he still traveled to Ohio to visit his girlfriend and also interacted appropriately with others at medical appointments throughout the relevant period. (AR 17). As to attention and concentration, the ALJ noted that no significant problems with concentration or

12

memory were documented in consultative examinations by Paula Neuman, Psy.D., and L. Predina, Ph.D. (AR 17 (citing AR 551-56, 889-92)). The ALJ further considered that Dr. Neuman concluded that Donley's "ability to understand, remember, and carry out simple instructions in a sustained manner was unimpaired." (AR 17 (citing AR 556)). As to sleep disturbances, the ALJ observed that from January 2016 to August 2016, Donley generally denied having any sleep problems to Ms. Russell, except for once in April when he had run out of Abilify and once in June due to tooth pain. (AR 24-25 (citing AR 1235-55)). The ALJ also considered that Donley had repeatedly denied any medication side effects to Mr. Cain. (AR 1265-77). Therefore, while the ALJ did not specifically discuss Ms. Russell's and Mr. Cain's opinion that Donley's symptoms would worsen if he returned to full-time work, the ALJ did address the reasons that Ms. Russell and Mr. Cain gave for issuing this opinion, as well as their opinion that Donley would be absent more than three days a month.

Next, Donley argues that the ALJ incorrectly stated that "none of the records suggests that [Donley] is 'detached from reality,' at times, as noted by Ms. Russell." (AR 25). Donley points to his initial treatment visits in December 2012 when he reported being afraid of things that other people are not afraid of and that people were trying to control him (AR 797), and a note from May 2013 when he reporting feeling paranoid (AR 831). While the ALJ's phraseology could have been better, the ALJ nevertheless made his point—that Ms. Russell did not document in her treatment notes that Donley suffered from any hallucinations, delusions, or impairment in reality testing. *See Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) (in reviewing an ALJ's decision, the Court must "give the opinion a commonsensical reading rather than nitpicking at it" (citation omitted)). Rather, as the ALJ observed, in her treatment records

13

Ms. Russell assigned Donley a GAF score of 55, reflecting just moderate symptoms, and wrote that his symptoms continued to improve. (AR 24 (citing AR 1232)). As such, the severe limitations in Ms. Russell's questionnaire are undermined by her documentation of moderate symptoms in her treatment notes.

Donley also takes issue with the ALJ's statement that "Ms. Russell has consistently noted that no sleep disturbance was present since January 2016" (AR 25), arguing that there is much evidence in the record supporting his sleep problems. Donley points to several of Ms. Russell's notes in which she simply reiterates the laundry list of symptoms that Donley claimed upon his initial visit in October 2012. (DE 19 at 16 (citing AR 797, 877, 898, 1232)). But as explained above, Donley denied any sleep problems to Ms. Russell from January 2016 to August 2016, other than once when he had run out of Abilify and once due to tooth pain. (AR 24-25 (citing AR 1235-55)). Donley also contends that some of Mr. Cain's treatment notes reflect sleep problems.[4] (DE 19 at 16 (citing AR 1265, 1270, 1277)). But the ALJ never said that Mr. Cain's treatment notes were devoid of Donley's sleep problems. Rather, the ALJ discounted Mr. Cain's questionnaire because the GAF scores of 70 and 75, which were indicative of just mild or transient symptoms, assigned by Mr. Cain in his treatment notes are inconsistent with the severe limitations depicted in his questionnaire. (AR 25 (citing AR 1269-74)).

Next, Donley argues that the ALJ improperly considered the GAF scores of record,

---

[4] Donley also points to several other notes of record documenting his sleep problems or fatigue. (DE 19 at 16 (citing AR 747, 758, 763, 772, 777, 778, 889, 890, 1188)). These records, however, do not reflect the severity of sleep problems or fatigue claimed by Donley during his testimony (AR 43-49, 51-53, 57), and Donley does not challenge the ALJ's credibility determination. Furthermore, on at least one occasion Donley had not been using his CPAP machine, which the provider wrote "certainly correlates with his fatigue symptoms" (AR 747, 750); as such, the ALJ stated that it was unclear whether Donley had continued using the CPAP machine as recommended. (AR 16, 19-20). Ultimately, the ALJ acknowledged that Donley's obstructive sleep apnea and coronary artery disease were severe impairments at step two, and accordingly, limited him to sedentary work from an exertional standpoint. (AR 15, 18, 22). As stated earlier, Donley does not challenge the physical RFC assigned by the ALJ.

14

which range from 51 to 55 by Ms. Russell and 70 to 75 by Mr. Cain. (AR 24-25). Donley contends that these scores are just snapshots of given dates, and thus, are unreliable evidence given that mental illness is episodic. (*See* DE 19 at 17 (citing *Kangail v. Barnhart*, 454 F.3d 627, 629 (7th Cir. 2006)). There is some support for Donley's argument in Seventh Circuit case law. *See, e.g.*, *Sambrooks v. Colvin*, 566 F. App'x 506, 510 (7th Cir. 2014) ("[A] GAF score is nothing more than a snapshot of a particular moment." (citation omitted)); *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) ("[A] person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about her overall condition." (citations omitted)). Nevertheless, this is not a case where the ALJ "cherry-picked" the highest GAF scores of record and ignored the lowest. *See, e.g.*, *Sambrooks*, 566 F. App'x at 510; *Ingle v. Astrue*, No. 10-cv-1002, 2011 WL 5834273, at *7 (S.D. Ill. Oct. 28, 2011) (finding that the ALJ erred by "cherry-picking" the claimant's highest GAF score and ignoring the remaining scores). Rather, the ALJ fairly considered the GAF scores of record. (AR 24-25). "[GAF] scores may assist in formulating the claimant's [RFC]." *Adams v. Astrue*, No. 1:06-cv-393, 2009 WL 1404675, at *4 (N.D. Ind. May 18, 2009) (citation omitted)). As such, the ALJ did not unfairly consider the GAF scores assigned by Ms. Russell and Mr. Cain.

Additionally, Donley argues that the ALJ's reference to the notes of other medical providers do not support the severe mental limitations opined in Ms. Russell's and Mr. Cain's questionnaires. (AR 25). The ALJ considered, for example, that no mental symptoms were reported or observed by Dr. Nicholas Nussbaum, Donley's primary care provider, from September 2013 through April 2016 (AR 25 (citing AR 671-709, 903-08, 1075-1099)), and that Donley at times denied mental symptoms during visits with other providers (AR 25 (citing AR

917-34, 977-81, 1193-1222)). Donley argues that these other medical sources, however, were focused on his physical ailments, and there is no reason to expect a doctor consulted about a physical problem to diagnose depression or anxiety. Again, there is some support for Donley's position in Seventh Circuit case law. *See, e.g.*, *Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir. 1995) ("The medical records were of purely physical ailments for which Wilder had sought help, and there is no reason to expect a doctor asked about an eye problem, or a back pain, or an infection of the urinary tract to diagnose depression." (citations omitted)).

Nevertheless, as stated earlier, the ALJ *also* relied on the opinion of Dr. Neuman, who performed a mental examination in March 2014 and concluded that Donley's "ability to understand, remember, and carry out simple instructions in a sustained manner is not impaired." (AR 17 (citing AR 556)). This finding in Dr. Neuman's opinion, of course, directly conflicts with the severe limitations articulated in the questionnaires of Ms. Russell and Mr. Cain. Therefore, the ALJ had a duty to confront and resolve that conflict, which he adequately did. *See Richardson v. Perales*, 402 U.S. 389, 399 (1971) ("We therefore are presented with the not uncommon situation of conflicting medical evidence. The trier of fact has the duty to resolve that conflict."); *Rice*, 384 F.3d at 371 (stating that an ALJ must "minimally articulate his or her justification for rejecting or accepting specific evidence of a disability" (citation omitted)).

But in citing Dr. Neuman's opinion, the ALJ overlooked or ignored another material finding in Dr. Neuman's opinion—one that *is* consistent with Ms. Russell's and Mr. Cain's opinions. *See Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014) ("[T]he ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." (collecting cases)); *Perkins v. Astrue*, 498 F. App'x 641, 632 (7th Cir. 2013)

16

("An ALJ may not . . . selectively consider medical reports." (citations omitted)). Dr. Neuman *also* concluded that Donley's "ability to interact in a reasonably effective and stable manner with the general public, *coworkers* . . . is reportedly impaired due to inability to focus, panic attacks, and paranoia that someone is going to harm him." (AR 556 (emphasis added)). While the ALJ incorporated a limitation in the RFC to preclude Donley from working with the general public, he did not include any limitations pertaining to Donley's proximity to or interaction with coworkers or supervisors—a limitation that Dr. Neuman, Ms. Russell, and Mr. Cain all opined was necessary.

The ALJ's handling of the opinions of the state agency psychologists, B. Randal Horton, Pys. D., and Joelle Larsen, Ph.D., further muddies the ALJ's consideration of Donley's social limitations. These doctors opined that Donley was moderately limited in his ability to interact with the general public but not his coworkers, which would support the ALJ's outcome. (AR 146, 162). However, rather than credit these opinions, the ALJ rejected them, stating that Dr. Horton's and Dr. Larsen's opinions were "inconsistent" because "no social limitations were defined." (AR 26). As such, the Court cannot trace the ALJ's reasoning with respect to the medical sources of record and the assigned social limitations in Donley's RFC. *See Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000) (stating that an ALJ is required to "build an accurate and logical bridge between the evidence and the result").

Therefore, while the ALJ's decision to assign limited weight to the opinions of Ms. Russell and Mr. Cain is, in part, supported by substantial evidence, a remand is necessary so that the ALJ may reconsider the opinions of the medical and other sources of record pertaining to Donley's social limitations, and then minimally articulate his reasoning, building an accurate and

17

logical bridge between the evidence and the mental RFC.[5]

## IV. CONCLUSION

For the foregoing reasons, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion and Order. The Clerk is directed to enter a judgment in favor of Donley and against the Commissioner.

SO ORDERED.

Entered this 8th day of November 2018.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge

---

[5] Because a remand is warranted based on Donley's argument concerning the opinions of Ms. Russell and Mr. Cain, the Court need not reach his remaining argument.